**HARVEY N. FERTIG**
363 Seventh Avenue, 7th Fl.
New York, NY 10001
Telephone: (212) 533-2606
Fax: (212) 505-6681

Attorney For Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

OPT OUT OF IEAM, LLC, as Assignee, and on behalf
of the following individual Shareholders who opted out
of the prior Class Action Proceeding against defendant,
Industrial Enterprises of America, Inc. (IEAM), Edward
McCabe( for himself; as managing member of EFM
Capital,LLC; and on behalf of the Edward McCabe IRA),
Joel Burger, Patrick Byrne,
Brian Denyeau, Caroline Renck Dow, Cobblestone Asset
Mgmt.,Joni Geiger,Dan Hendrickson, Charles
Hendrickson,Terrance & Kimberly Holm, Mark Johnson,
Carol Kahn, Elaine Kroll Revocable Trust, Jeffrey P.
Knightly, Brendan D. McCabe,
Edward F. McCabe III, Brendan & Melanie
MacMillian, Hugh Frederick MacMillian, Henry &
Eileen Matthews, Michael Palazzi IRA, Michael
T. Richards, Jonathan Raleigh,Sue Sanders,
Constance Sczesny Trust, Edward Sczesny Trust,
Heather L. Ordal Vinar,Vance Vinar, Vance G. Vinar,Jr.,
Andrew & RobertaWallace, Edwin J. Wilmot, Chad
Wolff, Courtney Wolff and Scott Wolff,  (collectively the
"Plaintiffs")

|  |  |
|---|---|
| | **COMPLAINT** |
| | Case No. 11-cv-08470 |

Plaintiffs,

v.

INDUSTRIAL ENTERPRISES OF AMERICA, INC.;

Defendant,

LAURENCE M. ROSEN, ESQ.,

Nominal Defendant Stakeholder.

**JURY TRIAL DEMANDED**

------------------------------------------------------------------X

1

OPT OUT OF IEAM, LLC, as assignee and on behalf of the following shareholders who opted out of the prior Class Action Lawsuit entitled *ANNMARIE MALLOZZI INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED vs. INDUSTRIAL ENTERPRISES OF AMERICA, INC. ET AL (SDNY CASE NO.07-CV-10321 (GBD)*, (collectively the "Plaintiff") individually and on behalf of all other persons similarly situated, by their undersigned attorney, allege in this Complaint (the "Complaint") the following upon their knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel which included, inter alia: (a) review and analysis of relevant filings made by Industrial Enterprises of America, Inc. ("IEAM" or the "Company") with the United States Securities and Exchange Commission (the "SEC") ; (b) review and analysis of defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) information readily obtainable on the Internet or other public information; and (e) interviews of several witnesses with personal knowledge of the relevant facts.

Plaintiffs believe that further substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities action on behalf of plaintiffs consisting of persons who purchased or otherwise acquired any common stock of INDUSTRIAL ENTERPRISES OF AMERICA, INC. ("IEAM") directly or indirectly during the period

from December 4, 2006 through and including November 7, 2007 the "Class Period" that was so designated in the prior class action lawsuit against defendant IEAM, and were damaged thereby (the "Class"). Individual plaintiffs have all entered an agreement with Opt Out of IEAM, LLC to administer the prosecution of this action on their behalf inter alia in order to contain costs. The Managing Member of Opt Out of IEAM, LLC is Edward McCabe an individual plaintiff who opted out of the original action. Mr. McCabe holds shares in his IRA and as a managing member of a limited liability corporation. Other members who opted out hold their shares in various capacities.

## BACKGROUND

Plaintiffs in this case are persons who filed valid and timely requests for exclusion from a prior class action settlement approved by this Court's Order that was filed as of April 20, 2011 in the case of Annmarie Mallozzi, individually and on behalf of all other similarly situated, Plaintiffs vs. Industrial Enterprises of America, Inc., John Mazzuto; Jorge Yepes; Dennis O'Neill; and James Marguiles, Defendants. (Case No.: 07-cv-10321-GBD.)

The parties in the IEAM class action suit entered into a " Superseding Stipulation and Agreement of Settlement" dated December 9, 2010 (a copy is annexed hereto as Exhibit A) , which was approved by Order of the District Court of the Southern District of New York dated May 31, 2011 ( a copy is annexed hereto ass Exhibit B).

The initial Settlement Agreement for the prior case was $3,400,000, less $100,000.00 for previously incurred notice costs that were paid by the Defendants' insurer which comprised of $2,300,000.00 to be paid to all plaintiffs who had not excluded themselves from the Class and $1,000,000,00 to be held in a " Holdback Fund " to fund

any Holdover Proceedings commenced by any Opt Out Parties and potential opt out parties against the Defendants. The "Holdback Fund" is currently being held in a certain Escrow Account No. 2 established and maintained under the Superseding Settlement Agreement at TD Bank, N.A. Pennsylvania.

The" Holdback Fund"has been paid by the Insurer from the Policy's Limit of Liability and is currently being held in Escrow Account No. 2 by the Second Escrow Agent Laurence M. Rosen, Esq., of The Rosen Law Firm,P.A., 350 Fifth Avenue, Suite 5508, New York, New York 10118.

Pursuant to the Superseding Settlement Agreement, the Holdback Fund is to be used solely for the purpose of payment of any reasonable attorney's fees and other defense costs of the Defendants in any new Holdover Proceedings commenced by the Opt Out Parties,and to be used in good faith to pay any settlements, judgments or awards in the Holdover Proceedings.

2.     Among other things hereinafter alleged defendant perpetuated an accounting fraud during the Class Period by materially overstating revenue reported in the Company's publicly filed financial statements and other public announcements for the purpose and effect of artificially inflating the market price of IEAM stock.

3.     Defendant's violations of Generally Accepted Accounting Principles ("GAAP") caused the Company to overstate reported revenues for the quarters ended December 31, 2006 ("Q2 2007") by $3.1 million (22.2% overstatement) and March 30, 2007 ("Q3 2007") by $4.9 million ($38.5% overstatement).  Moreover, defendant overstated the Company's EBITDA for Q2 2007 by $1.3 million (28.9% overstatement), Q3 2007 by $3.5 million (184% overstatement), and the quarter ended June 30, 2007 ("Q4

2007") by $1.5 million (60% overstatement). For each period, the reported revenue figures met or exceeded the Company's previously issued guidance figures.

4.      Defendant perpetrated its scheme by improperly recognizing revenue from "bill and hold" sales arrangements in a manner that violated both GAAP and the Company's internal revenue recognition policy.

5.      A "bill and hold" arrangement occurs when a seller charges a buyer for products but retains possession of the goods until they are shipped at a later date. Pursuant to GAAP, revenue is generally recognized under these arrangements when goods are shipped to the buyer or to a designated location selected by the buyer, not at the time of billing.

6.      In addition to its improper "bill and hold" accounting practices, IEAM falsely stated to its investors that it recognized revenues *only* when goods were shipped in compliance with GAAP. For example, during a May 22, 2007 investor conference call, the former president of IEAM, stated that IEAM recognizes revenues *only* when goods are actually shipped to purchasers.

7.      The truth about IEAM's actual accounting practices began to emerge on October 15, 2007, when the Company announced it was reviewing the propriety of its previously undisclosed "bill and hold" sales arrangements. This adverse announcement caused the Company's stock to fall approximately 16%, from $3.99 to $3.37 per share, on heavy trading volume.

8.      Additional details emerged on November 7, 2007 after the market closed when the Company announced that its previously issued financial statements and other public statements for both Q2 2007 and Q3 2007 should not be relied upon because the

Company had overstated its revenues by $3.1 million (22.2%) and $4.9 million (38.5%) respectively.  This announcement caused the Company's stock to fall *almost 64%* (from $2.19 per share to only $0.80 per share) on the first trading day after the announcement and an *additional 15.1%* (from $0.80 per share to $0.68 per share) the following day.

9.      On the same day, the Company announced that its Board of Directors had suspended the Company's Chief Financial Officer, pending an internal integrity review with counsel retained by the Board of Directors.

10.      In the wake of these adverse disclosures, nearly all of IEAM's senior officers and directors were either terminated for cause or resigned.

11.      The representations in the Company's press releases and SEC filings  issued during the Class Period were materially false and misleading when made because they failed to disclose the following:

(a)      the Company's "bill and hold" practices did not comply with GAAP;

(b)      the Company's "bill and hold" practices did not comply with the Company's own stated policy of revenue recognition;

(c)      the Company overstated its reported revenue for Q2 2007 and Q3 2007 by 22.2% and 38.5% respectively;

(d)      the Company overstated its reported EBITDA for Q2 2007, Q3, 2007 and Q4 2007 ranging from 28.9% to 184%; and

(e)      defendant had both the motive and the opportunity to commit the alleged fraud described herein through an undisclosed insider trading scheme resulting in illicit profits of nearly $1.2 million.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

14.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 139 (b) as a substantial part of the conduct complained of herein occurred in this District.

15.     In connection with the acts, conduct and other wrongs alleged herein, defendant either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.     Plaintiff, OPT OUT OF IEAM, LLC. is a limited liability corporation formed under the laws of the State of New York and its members are individuals who joined the plaintiff to pursue this lawsuit and had been individuals who opted out of a prior settlement with the defendant and were given an additional two years and one day from November 24, 2009 to commence a lawsuit against the defendant.

16.     Defendant IEAM is a Nevada corporation with its principal executive offices during the period herein located at 711 Third Avenue, Suite 1505, New York, New York  10017.

17.     IEAM, through its wholly-owned operating subsidiaries, was an aftermarket supplier of anti-freeze, motor oil and other chemical products used in automobiles.  From the beginning of the Class Period through April 23, 2007, the Company's common stock was listed on the NASDAQ Bulletin Board under the ticker symbol "IEAM.OB."  At all relevant times thereafter, the Company's common stock was listed on the NASDAQ Capital Market under the ticker symbol "IEAM" until its delisting on February 15, 2008.

18.     On November 21, 2007, the Company announced that John Mazzuto retired as an officer of the Company.  Mazzuto remained in  other positions through December 31, 2007 and continued to serve as a member of the Board of Directors.  In a contradictory press release issued on February 6, 2008, however, the Company announced that Mazzuto had resigned from those positions on February 5, 2008 "effective immediately."

19.     Dennis O'Neill ("Oneill") served  as the Company's CFO from March 19, 2007 through May 15, 2007, at which time he relinquished the position due to a reported illness.  Although the Company appointed John Mazzuto to serve as interim CFO at this time, O'Neill never returned to work for the Company.  Prior to becoming CFO, O'Neill served as the Company's Controller.

20.     Jorge Yepes ("Yepes") served as the Company's CFO from September 4, 2007 through November 6, 2007.  Yepes became the Company's full time CFO after O'Neill's illness and Mazzuto's interim service as CFO.  According to a press release issued on September 4, 2007, CFO Yepes was "responsible for improving Industrial Enterprises' corporate governance and financial transparency ... he will be in charge of accounting and reporting, strategic planning ...".  On November 7, 2007, however, the

Company announced that Yepes had been suspended as CFO in connection with Company policy violations, allegedly unrelated to auditing matters. Thereafter, John Mazzuto once again assumed the role of interim CFO. On February 11, 2008, the Company announced that Yepes was terminated from the Company for cause following an internal investigation.

21.    Robert "Dan" Redmond ("Redmond") had served as the President and Chief Operating Officer ("COO") of the Company from July 20, 2007 until on or about September 2008. Redmond was "responsible for all day-to-day operations and reporting to the chief executive officer." Redmond first joined Company in April 2007 and was later appointed as the Company's Executive Vice President and President of Pitt Penn Oil Co., LLC, one of the Company's main operating subsidiaries.

24.    James Margulies ("Margulies") served contemporaneously and at various times as CEO, CFO and Director of IEAM since a re-appointment on February 5, 2008 to on or about March 2009. Since the beginning of the Class Period, as designated in the prior class action lawsuit of Mallozzi v. IEAM, Margulies had served as head of the Company's Legal & Compliance Department. Prior to December 4, 2006, Margulies served as the Company's CFO, Vice President and Secretary. Margulies was a named partner of the Cleveland law firm Margulies & Levinson, LLP. Many of the Company's periodic reports filed with the SEC were created using EDGARizer HTML software, licensed to Margulies & Levinson, LLP. (*See* SEC's EDGAR Full-Text Search system).

25.    Each of the officers of IEAM, INC., Mazzuto, Yepes, O'Neill, Redmond and Margulies :

(a)    directly participated in the management of the Company;

(b)     were directly involved in the day-to-day operations of the Company at the
        highest levels;

(c)     were privy to confidential proprietary information concerning the Company
        and its business and operations;

(d)     as involved in drafting, producing, reviewing and/or disseminating the false
        and misleading statements and information alleged herein;

(e)     were aware of or recklessly disregarded the fact that the false and
        misleading statements were being issued concerning the Company; and

(f)     approved or ratified these statements in violation of the federal securities
        laws.

26.     As officers, directors and controlling persons of a publicly-held company
whose common stock is and was registered with the SEC pursuant to the Exchange Act,
and was traded on the NASDAQ and the NASDAQ Bulletin Board and governed by the
provisions of the federal securities laws, the officers each had a duty to disseminate
accurate and truthful information promptly with respect to the Company's financial
condition and to correct any previously-issued statements that had become materially
misleading or untrue to allow the market price of the Company's publicly-traded stock to
reflect truthful and accurate information.

27.     IEAM is liable for the acts of its officers and its employees under the
doctrine of *respondeat superior* and common law principles of agency as all of the
wrongful acts complained of herein were carried out within the scope of their employment
with authorization.

28.     The scienter of the officers and other employees and agents of the Company is similarly imputed to IEAM under *respondeat superior* and agency principles.

## GAAP REVENUE RECOGNITION GUIDELINES

29.     During the Class Period, each financial statement issued by the Company explained that IEAM's financial results conformed with GAAP, the uniform rules, conventions and procedures that define accepted accounting practices.  As set forth in Statement of Financial Accounting Concepts ("SFAC") No. 1, Objectives of Financial Reporting by Business Enterprises, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance.  Specifically:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

SFAC No. 1, ¶ 47.

30.     The SEC requires that public companies prepare and file quarterly and annual financial statements in conformity with GAAP.  SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). (Emphasis added).

31.     Management retains responsibility for preparing financial statements that conform with GAAP.  The American Institute of Certified Public Accountants ("AICPA") Professional Standards provide:

> The financial statements are management's responsibility …
> Management is responsible for adopting sound accounting
> policies and for establishing and maintaining internal
> controls that will, among other things, record, process,
> summarize, and report transactions (as well as events and
> conditions) consistent with management's assertions
> embodied in the financial statements. The entity's
> transactions and the related assets, liabilities, and equity are
> within the direct knowledge and control of management ….
> Thus, the fair presentation of financial statements in
> conformity with generally-accepted accounting principles is
> an implicit and integral part of management's responsibility.

AICPA, Professional Standards, vol. 1, AU § 110.02 (1998).

32.     Restatements are required for material accounting errors that existed at the time financial statements were prepared.  See Statement of Financial Accounting ("SFAS") 154, ¶ j.  An error is a term of art and results from, among other things, an error in recognition, measurement, or mistakes from in the application of GAAP.  SFAS 154, ¶ h.

33.     Under a "bill and hold" arrangement, the seller of goods bills a customer for products but does not ship the products until a later date. According to the SEC's Staff Accounting Bulletin No. 104 ("SAB 104"), revenue may be recognized on a "bill and hold" arrangement only when, *inter alia*, delivery of the product is made to the purchaser's place of business or another site specified by the purchaser.

34.     In order to comply with GAAP when delivery has not occurred in a "bill and hold" arrangement, SB 104 requires the following before revenue is recognized:

(a)     the risks of ownership must have passed to the buyer;

(b)     the customer must have made a fixed commitment to purchase the goods, preferably in written documentation;

(c)     the buyer, not the seller, must request that the transaction be on a "bill and hold" basis;

(d)     the buyer must have a substantial business purpose for ordering the goods on a "bill and hold" basis;

(e)     there must be a fixed schedule for delivery of goods;

(f)     the date for delivery must be reasonable and must be consistent with the buyer's business purpose (*e.g.,* storage periods are customary in the industry);

(g)     the seller must not have retained any specific performance obligations such that the earning process is not complete;

(h)     the ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and

(i)     the equipment [product] must be complete and ready for shipment.

35.     Under GAAP, revenue should not be recognized until it is realized or realizable, and earned.  SFAC No. 5 ¶¶ 83-84.

36.     According to SAB 104, revenues are generally realized and earned when the following criteria are met:

(a)     persuasive evidence of an arrangement exists;

(b)     delivery has occurred or services have been rendered;

(c)     the seller's price to the buyer is fixed or determinable; and

(d)     collectibility is reasonably assured.

37.     The Company's public statements represented that the Company complied with internal revenue recognition policies and the mandates of SAB 104.  Specifically:

(a)     The Company's Form 10KSB/A filed with the SEC on December 28, 2007, stated: "Revenues are recognized as earned.  **Sales are recorded when products are shipped to customers."** (Emphasis added);

(b)     The Company's Form 10KSB filed with the SEC on November 14, 2006, stated: "Revenues are recognized as earned.  **Sales are recorded when products are shipped to customers."** (Emphasis added);

(c)     the Company's quarterly reports filed on Forms 10QSB on February 16 and May 22, 2007, failed to properly disclose the Company's revenue recognition policy on "bill and hold" arrangements because these reports stated that revenues are recognized upon delivery of products to the customer or through sales to distribution channel, without any mention of "bill and hold" arrangements or the Company's revenue recognition policy.

## SUBSTANTIVE FACTUAL ALLEGATIONS OF FRAUD

**Defendants Engaged in a Series of Accounting Improprieties Designed to Inflate the Company's Financial Results in Violation of GAAP and the Company's Own Revenue Recognition Policy**

38.     The Company failed to satisfy the criteria established under SAB 104 and, consequently, improperly recognized revenues on "bill and hold" arrangements in violation of GAAP and in violation of its own stated practices.  Specifically, on November 7, 2007, the Company revealed that "after reviewing its bill and hold transactions for fiscal 2007, that the Company did not properly follow GAAP revenue recognition."  Thus, IEAM's "bill and hold" sales were improperly recognized as revenue.

39.     On the same day, the Company stated that it cancelled the revenue it recognized on certain "bill and hold" transactions because the buyers were unable to take delivery of the Company's products.  Instead, the Company issued 2.4 million shares of the Company's restricted stock to these purchasers to settle any claims they may have against the monies paid to the Company.  The November 7, 2007, announcement stated in relevant part as follows:

> All bill and hold purchases were paid in full, and cash was received prior to June 30, 2007, but because the buyers were unable to take delivery of their merchandise, the Company was forced to cancel these transactions and will reflect an approximate $8 million in liabilities on its books at the year ended June 30, 2007. The buyers of the bulk purchases have agreed to settle their potential claims for these cancelled sales for 2.4 million shares of restricted stock and the above purchase and delivery of product. This settlement will remove the liability during the second quarter ended December 31, 2007. Additionally, Industrial Enterprises has the option to repurchase these shares at current market prices.

The Company never disclosed the reasons behind the failure of the buyers to take delivery of the merchandise.  However, SAB 104 provides in relevant part, "if uncertainty exists about customer acceptance, *revenue should not be recognized until acceptance occurs.*" (Emphasis added).


40.     In stark contrast to both SAB 104 requirements and the Company's stated policy, the Company's November 7, 2007 announcement revealed that the risks and rewards of ownership *did not* pass from the Company to the purchasers, because the purchasers effectively had a right of return or contingency that allowed the purchasers to demand their purchase monies back if they elected not to accept the Company's goods.

41.     Consequently, the Company failed to accurately disclose its revenue recognition policy on the "bill and hold" arrangements in its periodic filings with the SEC.  Instead, the Company stated that its policy was to recognize revenues when earned and when products are shipped to customers.

42.     GAAP required the Company to disclose its revenue recognition policy on "bill and hold" arrangements.  Accounting Principles Board Opinion No. 22 required the Company to disclose its revenue recognition policy in this regard in the Company's GAAP prepared financial statements, yet no such disclosures were made by the Company in violation of GAAP.

43.     SAB 104 also required disclosure of the Company's revenue recognition policy on "bill and hold" arrangements.  SAB 104 states in relevant part:

> Because revenue recognition generally involves some level of judgment, the staff believes that a registrant should always disclose its revenue recognition policy. If a company has different policies for different types of revenues transaction … the policy for each material type of transaction should be disclosed.

44.     The Company selectively disclosed in its Form 10QSB filed with the SEC on May 22, 2007, that it engaged in "bulk sales" of its products, but failed to disclose that some or all of the "bulk sales" were made with "bill and hold" arrangements or the fact there were "bill and hold" arrangements for non "bulk sales".  Rather than inform investors of the truth, during a May 22, 2007 conference call, defendant Mazzuto falsely reassured investors about the Company's policy as follows:

> **<Q – Bob Renck**:  Good morning, John.  Couple of questions, Stuart actually asked some of them, but in the 10-Q you talked a little bit about revenue recognition policies, and on page 16 of the Q in the first paragraph, you make a statement that I don't understand and maybe you could clarify. The company has a

revenue recognition policy, which it follows in recognizing such sales, and that refers to bulk sales. What is the revenue recognition policy?

<A – John Mazzuto: It has to be – a lot of bulk sales people actually buy it in place on the floor, et. cetera, and it is both you move it when they want it, I don't like that policy. *We recognize sales when it's gone to a wholesaler and they moved it off our premises and it is in their warehouse.*

(Emphasis added).

**The Company Issued Materially False and Misleading Statements <u>Concerning Its Business During the Class Period  From Dec.4, 2006 through Nov. 7, 2007</u>**

45.     The defendant through its officers knew or recklessly disregarded numerous facts known to them before and during the Class Period concerning, *inter alia*, that the Company's "bill and hold" practices did not comply with GAAP, that the Company's "bill and hold" practices did not comply with the Company's own stated policy of revenue recognition, and that the Company overstated its reported revenue for Q2 2007 and Q3 2007.  Notwithstanding the foregoing, the defendant made the following materially false and misleading statements of material fact:

**i.      <u>False and Misleading December 2006 Announcements</u>**

46.     The Class Period began on December 4, 2006 when the Company issued an intentionally false and misleading press release concerning the Company's anticipated Q2 2007 results.  The press release noted that Q2 2007 revenues were anticipated to be significantly higher as a result of increased production. The press release stated relevant part as follows:

John Mazzuto, Chief Executive Officer of Industrial Enterprises of America, commented, "Our first quarter results, as previously announced, are in line with guidance provided by the Company. During this, our second quarter,

> we anticipate a significant increase *in revenues as we continue to increase our production capacity with similar gross margins …".*

(Emphasis added).

47.     The next day, the Company reported expected revenues of $16 million for Q2 2007 in a Form 8-K filed with the SEC as follows:

> On Tuesday, December 5, 2006 at 9:00 a.m. Eastern Time, Industrial Enterprises of America, Inc. (the "Company") held a public conference call to discuss the result of its first quarter. During the call, John D. Mazzuto, the Company's Chief Executive Officer and interim Chief Executive Officer, disclosed material information that may not have been publicly disclosed in the past.
>
> Mr. Mazzuto projected that the Company could anticipate revenues of $16 million for the second fiscal quarter of 2007, $20 million for the third quarter and over $50 million potentially for the fourth quarter. Additionally, Mr. Mazzuto projected earnings per share of approximately $0.22, $0.33 and $.50, respectively, for the second, third and fourth quarters of fiscal 2007, before any charges related to derivative securities.

48.     The Company subsequently reported that it exceeded its projected $16 million in revenues for Q2 2007, reporting revenues of almost $17 million on February 16, 2007.

49.     The statements of anticipated revenues for Q2 2007 detailed in the December 4, 2006 press release, and Form 8-K were intentionally false and misleading when made because, as set forth in ¶¶ 3-41 above, the Company has admitted that at the time:

(a)    it improperly recognized revenues on products that were not shipped to is

customers under "bill and hold" arrangements in violation of GAAP for Q2 2007; and

(b)    that recognition of such revenues violated the Company's own revenue

recognition policy.

50.    Moreover, the intentionally false nature of the revenue projections were

evidenced by John Mazzuto's false and misleading statement on May 22, 2007 that "[w]e

recognize sales when it's gone to a wholesaler and they moved it off our premises and its

in their warehouse." This statement directly contradicted the Company's actual "bill and

hold" practices, demonstrating that Mr. Mazzuto intentionally misled investors

concerning the legitimacy of the revenue projected and subsequently recognized by the

Company.

### ii.    False and Misleading February 2007 Announcements

51.    On February 16, 2007, the Company issued a materially false and

misleading press release for the quarter ended December 31, 2006.  The press release and

corresponding Form 8-K reported revenues of $17 million for Q2 2007.  The

announcement also reported EBITD of $5.8 million for the six months ended December 21,

2007.

52.    The revenues and earnings reported by the Company for Q2 2007 exceeded

the Company's revenue target and the reported EDITDA was within range of the

Company's estimates. On February 16, 2007, John Mazzuto stated, in relevant part: "We

exceeded our revenue target while EDITDA came within an acceptable range ...." John

Mazzuto also noted the following: "By focusing on non-seasonal items and limiting our

winter inventory, our production, up 70% from just three months ago, allowed us to grow dramatically."

53.     In conjunction with the Company's February 16, 2007 press release, the Company filed its financial statements for Q2 2007 on Form 10QSBwith the SEC. This 10QSB reported substantially similar revenue amounts as the February 16, 2007 press release. The Form 10QSB was signed by defendant Mazzuto as the Company's CEO and CFO, and also certified by him pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial information contained in the 10QSB.

54.     The February 16, 2007 press release and 10QSB were materially false and misleading at the time the statements were issued as evidenced by the Company's November 7, 2007 announcement which revealed that the Company:

        (a)     improperly recognized revenues on products that were not shipped to its customer under "bill and hold" arrangements in violation of GAAP for Q2 2007;

        (b)     that recognition of such revenues violated the Company's own revenue recognition policy; and

        (c )

        consequently, the Company's reported revenues for Q2 2007 of approximately $17 million and EBIDTA for Q2 2007 of $5.8 million were overstated by $3.1 million or 22.2% and $1.2 million or 28.9% respectively.

55.     As a result of the Company's February 16, 2007 announcement, between February 13, 2007 and March 30, 2007, IEAM stock increased from $4.85 per share to $6.59 per share.

### iii.     False and Misleading May 2007 <u>Announcements</u>

56.     On May 22, 2007 the Company issued a press release reporting revenues of approximately $17.6 million for Q3 2007 and EBITDA of $6.8 million for the nine months ended March 31, 2007.

57.     EBITDA results purportedly met with the Company's previously announced target, in relevant part, as follows:

> ***"We are very pleased with our overall financial results***, with EBITDA on target prior to the inventory accounting correction. Revenues were lower than previously guided due to mild weather during the quarter, and a higher than expecting number of contract packaging contracts which recognize only processing fees, " commented John Mazzuto, Chief Executive Officer of Industrial Enterprises of America. "During the fiscal third quarter, the company increased unit through-put by approximately 30% through improved operating efficiencies and additional manufacturing shifts. ***Our order flow continues to outpace shipments***, and we will continue to leverage our production capacity and look at opportunistic acquisitions that can improve our asset utilization."

58.     In conjunction with the Company's May 22, 2007 press release, the Company filed its financial statements for Q3 on Form 10QSB with the SEC. The 10QSB reported substantially similar results and was signed and certified pursuant to SOX by John Mazzuto as the Company's CEO and CFO.

59.     Finally, as more fully described above, on the same day, the Company held an investor conference during which John Mazzuto assured investors that the Company's revenue recognition practices complied with GAAP, in pertinent part, as follows: "We recognize sales when its gone to a wholesaler and they moved it off our premises and it is in their warehouse."

60.     The May 22, 2007 press release, 10QB and conference call statements were materially false and misleading as evidenced by the Company's subsequent announcement on November 7, 2007 which reveals that the Company:

(a)     improperly recognized revenues on products that were not shipped to its customers under "bill and hold" arrangements in violation of GAAP for Q3 2007;

(b)     that recognition of such revenues violated the Company's own revenue recognition policy; and

(c)     consequently, the Company's initially reported revenues for Q3 2007 of approximately $17.6 million and Q3 2007 EBITDA of $6.8 million were overstated by $3.1 million or 22.2% and $3.5 million or 184% respectively.

### iv.     False and Misleading July 2007 Announcements

61.     On July 12, 2007, the Company issued a press release announcing its fourth quarter and annual financial results for the quarter and year ended June 30, 2007. The announcement stated that the Company's EBITDA for Q4, which had already ended, would be $4 million and would meet the Company's prior guidance.

62.     On July 20, 2007, the Company issued a press release clarifying certain statements in its July 12, 2007 press release. The July 20, 2007 press release stated in relevant part:

> The $4 million in anticipated earnings forecasted for the fourth quarter (up from $3.7 million last quarter) as referenced in the press release was calculated based on EBITDA. EBITDA (earnings before interest, taxes, depreciation and amortization) is a financial measure which it believes is a useful performance indicator.
> EBITDA is not a recognized term under generally accepted accounting principles, or "GAAP," and should not be considered as an alternative to net income/(loss) or net cash provided by operating activities, which are GAAP

measures. A reconciliation of EBITDA to net income/(loss) will be provided in the year-end earnings release, as will both actual results for the fourth quarter and full year period.

63.     EBITDA reported for Q4 in the July 12, 2007 announcement and later clarified and reiterated in the July 20, 2007 announcement was materially false and misleading as evidenced by the Company's November 7, 2007 announcement stating that EBITDA for Q4 2007 would be reduced by $1.5 million due to the exclusion of revenues from improper "bill and hold" arrangements.

64.     The Company's announcements on July 12 and July 20, 2007 were intentionally false and misleading when made because, in order to achieve a $4 million EBITDA for Q4, the Company had to include revenues from improper "bill and hold" arrangements. As set forth above, recognition of such revenues violated GAAP, the Company's own revenue recognition policy, and John Mazzuto's May 22, 2007 proclamation that "[w]e recognize sales when it's gone to a wholesaler and they moved it off our premises and it is in their warehouse."

65.     After repeatedly assuring its investors about the propriety of the Company's revenue recognition policy and practices, on October 15, 2007, after market close, the Company issued a press release announcing a review of its accounting practices. For the first time, the Company disclosed that it was engaging in "bill and hold" arrangements. As a result of the review, the Company stated that it was unable to timely file its annual report for fiscal year ended June 30, 2007.

66.     The October 15, 2007 adverse announcement, issued after market close, caused the Company's stock to fall nearly $.62 per share (15.5%) to $3.37 per share the

following day.  Over one million shares were traded the day after the announcement,

more than 33 times the prior day's trading volume.

67.     The October 15, 2007 announcement, however, falsely reassured investors

that management was working to improve the Company's financial reporting and

transparency, in relevant part, as follows:

> Dan Remond, President and Chief Operating Officer,
> commented, "New Chief Financial Officer, Jorge Yepes
> and I are committed to improving the financial reporting
> and transparency of the company. Since my arrival in April
> of this year, Industrial Enterprises has made numerous
> strides improving manufacturing inefficiencies and
> operational controls. We are dedicated to restoring our
> financial transparency in the marketplace. I am confident
> the company has the right people in place to deliver
> consistent growth and measurable results."

68.     In the same announcement Jorge Yepes stated:

> While we are disappointed that we will not be able to meet
> our filing extension, we are working diligently to ensure
> that our financial reports include improve financial
> disclosures and transparency.

69.     The October 15, 2007 statement by Jorge Yepes was materially false and

misleading because Mr. Yepes was not diligently working to timely file the Company's

overdue annual report with the SEC, nor working to improve the Company's financial

disclosures and transparency.  Less than a month later, on November 7, 2007, the

Company issued a press release, entitled "Industrial Enterprises of America Suspends

Chief Financial Officer," announcing the suspension of Mr. Yepes as the Company's

CFO due to potential violations of the Company's policies and procedures.  The press

release also announced the commencement of a review associated with the suspension.

On February 11, 2008, the Company terminated Mr. Yepes for "cause".

70.     On October 19, 2007, the Company announced that it had received a Staff

Determination Notice from NASDAQ because of IEAM's failure to timely file its annual

report for the fiscal year ended June 30, 2007.  The announcement explained the

purported rationale for the delay in filing the annual report as follows:

>           The reason for the delay in filing the Form 10-KSB is the
>           additional time required for Industrial Enterprises to review
>           the Company's revenue recognition policy and account for
>           a supplier that has been deemed a Variable Interest Entity.
>           Management is currently reviewing these changes with its
>           Audit Committee and its independent auditors. Until the
>           Audit Committee's review is complete, Industrial
>           Enterprises will be unable to complete and file its Annual
>           Report on Form 10-KSB for the year ended June 30, 2007.
>           The Company intends to file its Annual Report on Form
>           10-KSB as soon as practicable after the completion of the
>           review.

71.     The October 29, 2007 announcement caused the Company's stock to fall

5% ($0.19) from the previous closing price on the first trading day after the

announcement.

### IEAM, INC. States Previous Financial Statements Should Not be Relied On

72.     On November 7, 2007, the Company issued a press release entitled

"Industrial Enterprises Provides Accounting Update" which provided additional

information concerning the Company's "bill and hold" arrangements.  The press release

informed investors, for the first time, that the Company's previous financial statements

not be relief upon and that the previously reported results would require a statement. The

announcement stated in relevant part:

>           During the year-end annual audit, it has come to the
>           Company's attention that a supplier to the Company may
>           be required to be accounted for as a Variable Interest Entity

(VIE) due to the fact that the Company is its sole customer. Based upon further evaluation by both the Company and its auditors, the VIE does not appear to be material to the overall operations of the Company and consequently does not appear to require an audit or to be consolidated into the Company's financials. The Company's previous auditors are now reviewing this relationship during the fiscal 2006 time period and are evaluating whether the VIE needs to be consolidated into the Company's fiscal 2006 financials. Company management believe that the auditors will concur with the 2007 accounting treatment of the VIE, but no conclusion has yet been made. Management cautions that the filing of the 2007 Form 10KSB is contingent upon the Company filing the restated 2006 annual report.

***Additionally, the Company has determined, after reviewing its bill and hold transactions for fiscal 2007, that the Company did not properly follow GAAP revenue recognition procedures. Therefore, the bill and hold transactions for the quarter ended December 31, 2006 in the amount of approximately $3.1 million will be cancelled, and the bill and hold sales for the quarter ended March 31, 2007 in the amount of $4.9 million will also be cancelled. Such bill and hold sales represented $1.3 million of EBITDA in the quarter ended December 31, 2006 and $3.5 million of EBITDA in the quarter ended March 31, 2007. Also, the bill and hold transactions that were to take place in the 4th quarter have been cancelled. These sales would have accounted for EBITDA in excess of $1.5 million. Based on the cancellation of the fourth quarter bill and hold sales, the EBITDA guidance for the quarter is no longer applicable.*** Of the total cancelled bill and hold revenue, $1.6 million will be reflected in the first quarter of 2008 representing $1.1 million in EBITDA and $1.2 million in revenue will be recorded in the second quarter of 2008 representing EBITDA of approximately $400,000. The margins of these sales were unusual because the Company was able to sell finished goods inventory that the Company had purchased at distress prices. It is expected that the Company's customers will continue to execute bulk transactions in the future; however, the margins from the previous bill and hold transactions are not sustainable.

All bill and hold purchases were paid in full, and cash was received to June 30, 2007, but because the buyers were

> unable to take delivery of their merchandise, the Company
> was forced to cancel these transactions and will reflect an
> approximate $8 million in liabilities on its books at the year
> ended June 30, 2007. The buyers of the bulk purchases
> have agreed to settle their potential claims for these
> cancelled sales for 2.4 million shares of restricted stock and
> the above purchase and delivery of product. This settlement
> will remove the liability during the second quarter ended
> December 31, 2007.

(Emphasis added).

73.     This disclosure, coupled with the disclosure of Mr. Yepes' suspension as described above, caused the Company's stock to decline an astonishing *63.5%* - $1.39 per share on over 2.9 million shares traded – more than 20 times the previous day's volume. Company stock declined an additional 15.1% or $0.12 per share on November 9, 2007 on heavy volume.

## ADDITIONAL ALLEGATIONS DEMONSTRATING FALSITY AND SCIENTER

74.     The magnitude of IEAM's accounting errors relative to its overall operations – requiring the drastic step of an accounting restatement – demonstrates a cogent and compelling inference of scienter.

75.     IEAM's admission that its previously issued financial statements during the Class Period: (1) did not comply with GAAP; (ii) required a statement; and (iii) violated the Company's own revenue recognition policy demonstrates that IEAM's financial statements were false and misleading when issued.

76.     The Company overstated revenues by no less than 22% and as much as 38% during the Class Period. Likewise, the Company overstated its EBITDA by as much

as 184% during the Class Period. Such large percentages that favor the Company and that

met the Company's prior guidance demonstrate scienter.

77.      Numerous, additional questions raised about the propriety of the

Company's disclosures also demonstrate scienter:

(a)      On February 5, 2008 the Company disclosed, for the first time, a

material related party transaction in the amount of $4 million in connection with a non-

bank "credit line" the Company has incurred. The Company's February 5, 2008 press

release stated in relevant part:

> Additionally, Mr. Mazzuto will be assuming over $4
> million of unsecured debt. The payment of this debt had
> been guaranteed by Mr. Mazzuto and secured by personal
> assets and common stock controlled by Mr. Mazzuto at the
> time it was incurred in July 2007 as part of a  non-bank
> "credit line." The nature of these loans and guarantees had
> not previously been disclosed in public findings. The
> assumption of this debt is without recourse to the Company
> by Mr. Mazzuto or the lenders. As a result of this
> transaction, the company expects to incur an extraordinary,
> non-recurring, non-cash gain of over $4 million.

(b)      Pursuant to Item 404 of Regulation S-K, the Company was

obligated to disclose this related party transaction as it clearly exceeded the $120,000

threshold.

(c)      Mr. Mazzuto previously filed a Chapter 7 bankruptcy petition on

November 11, 2002 in the U.S. Bankruptcy Court for the Southern District of New York

(C.A. No. 02-15586 (RDD) (the "Bankruptcy").

(d)      On November 27, 2004 the Bankruptcy trustee filed a complaint

against Mazzuto for, among other things, knowingly and fraudulently withholding

documents relating to Mazzuto's property and financial affairs.

(e)     Neither the Bankruptcy nor the trustee's complaint were ever disclosed in the Company's reports filed with the SEC as required by the federal securities laws. The information was material to an evaluation of Mazzuto's ability to serve as CEO and his ability to adequately carry out his fiduciary duties.

(f)     On November 14, 2006, the Company amended and restated its financial statements for the year ended June 30, 2006 in order to correct an error concerning restricted cash in an attorney's escrow account that had been expended to satisfy a debt. Moreover, the Company had also restated its annual report for the fiscal year ended June 30, 2005 to correct the accounting treatment for an asset purchase agreement entered into by the Company in May 2004. The Company also had to restate the same annual report and the quarterly periods ended September 30, 2004, December 31, 2004, March 31, 2005, September 30, 2005, December 31, 2005 and March 31, 2006 in connection with the removal of $1.9 million in disputed liabilities from its books. This documented history of the Company's disregard for the mandates of GAAP further supports a cogent and compelling inference of scienter.

(g)     The termination or resignation of IEAM's management and directors during the period leading up to and following the announced restatement also demonstrates scienter:

(1)   On May 15, 2007 Mr. O'Neill left his post as CFO of the Company due to a reported illness;

(2)   On November 21, 2007 the Company announced that Mr. Mazzuto was to retire from the Company due to health reasons (like O'Neill before him) effective December 31, 2007. In fact, the announced reason for Mazzuto's departure from

the Company was untrue and an attempt to hide the real reason for his departure. On February 5, 2008 the Company announced Mr. Mazzuto had "resigned" effective immediately from the Company. Upon information and belief, Mr. Mazzuto was forced to "retire" or "resign" because of the accounting scandal. For example, while many CEOs and officers retire from a Company with a severance package, Mazzuto was forced to return 500,000 shares of previously issued Company stock according to a February 5, 208 Company announcement.

(h)     After the November 7, 2007 announcement concerning the suspension of Mr. Yepes on February 11, 2008 the Company announced that it had terminated Yepes for cause. Upon information and belief, Mr. Yepes' termination resulted from his acquiescence to the continued improper revenue recognition scheme alleged herein after he joined the Company in September 2007. The February 11, 2008 announcement stated in relevant part:

> Thomas J. Curran, a former securities prosecutor in the Manhattan District Attorney's Office and current Partner of Ganfer & Shore, LLP, acted as independent counsel. As noted in the November 7, 2007 press release, the purpose of the review was to investigate possible violations of the Company's policies and procedures.

> The review of Mr. Yepes [sic] conduct has been completed by the independent outside counsel to the Audit Committee. After consideration of that report, Mr. Yepes was given notice of his termination on February 11, 2008. As part of that notice IEAM has reserved any and all legal recourse against Mr. Yepes.

(i)     On the same day, Company director and audit committee member Michael J. Solomon inexplicably resigned.

(j)     The existence of an SEC investigation of IEAM and criminal proceedings against Mr. Yepes:

(1)     On June 12, 2008, Mr. Yepes was indicted (Indictment No. 08-CRIM-537 (S.D.N.Y.)) by a grand jury for three counts of wire fraud in connection with the following allegations: Yepes forged SEC communications to an employment recruitment agency in furtherance of his attempt to obtain a $300,000 per year job.

(2)     The indictment reveals that Mr. Yepes created false email communications between him and an SEC attorney, and that Mr. Yepes altered a letter he received from the SEC in connection with its investigation of IEAM; and

(3)     According to the indictment, Mr. Yepes falsified these documents in an effort to pass the employment agency's background search and to obtain the $300,00 per year CFO position at an unnamed company. These communications were falsified to imply that Mr. Yepes has cooperated with SEC's investigation of IEAM and that Mr. Yepes had provided valuable information to the SEC.

78.     According to the Company's February 19, 2008 press release, the Company is in the process of investigating the propriety of the continuing increase in the number of outstanding shares of the Company's stock beginning before, and continued throughout, the Class Period. According to the announcement, the increase in the Company's share count was a "surprise" to the Company's Board.

79.     John Mazzuto also had motive and opportunity to misstate the Company's earnings and revenue statements. Mr. Mazzuto was involved in undisclosed insider trading of the Company's stock through a third party intermediary from at least late 2006 through the Class Period that resulted in at least $1,145,000 worth of illicit proceeds.

80.     Confidential Witness No. 1 ("CW1") is a former business associate of an individual named Peter Vanucci. The two participated in several investment companies located in the same office in Cleveland, Ohio, including an entity named River Valley Asset Management, LLC ("River Valley"). CW1 was neither a control person of River Valley nor did he have check writing authority for River Valley. River Valley was owned and controlled by Mr. Vanucci. All of the following allegations under this section are derived from CW1's personal knowledge.

81.     Through a fraudulent "consulting agreement" between IEAM and River Valley, on or after March 14, 2006, IEAM issued River Valley 400,000 shares of IEAM common stock in payment for $100,000 worth of consulting services that were never performed. The shares of IEAM stock were deposited in a Scottrade account registered to River Valley controlled by Mr. Vanucci.

82.     Beginning in at least December 2006 and continuing through at least March 2007, under the direction of Mr. Mazzuto, Mr. Vanucci sold IEAM stock based upon non-public information provided by Mazzuto in order to maximize proceeds from each sale. Initially, the improper transactions were made by Mr. Vanucci under the direction of Mr. Mazzuto. Later, Mr. Vanucci provided the account login information for the Scottrade account to Mr. Mazzuto, thus allowing Mr. Mazzuto to make transaction independently. The IEAM stock that was sold during this undisclosed stock trading scheme included both the 400,000 shares obtained in exchange for the fraudulent consulting agreement and the additional shares Mr. Mazzuto transferred to the Scottrade account.

83.     The arrangement enabled Mr. Vanucci and Mr. Mazzuto to trade IEAM
stock on inside information and to sell IEAM stock Mr. Mazzuto had no authority to own
or sell in his own right. Upon information and belief, at least $1.145 million in proceeds
from these stock sales was wired from the Scottrade account to a Wachovia bank account
registered to "Industrial Enterprises" from December 2006 through March of 2007. The
transfers from the Scottrade account to IEAM's Wachovia bank occurred as follows:

- $200,000 on December 22, 2006;

- $100,000 on January 8, 2007;

- $60,000 on January 12, 2007;

- $200,000 on January 22, 2007;

- $75,000 on January 24, 2007;

- $275,000 on February 2, 2007;

- $35,000 on February 20, 2007;

- $100,000 on February 23, 2007;

- $75,000 on February 26, 2007; and

- $25,000 on March 26, 2007.

84.     As part of his role in the scheme, Vanucci was paid a percentage of the
proceeds from the stock sales, believed to be approximately 10%, while the remaining
profits were funneled back to bank accounts owned or controlled by defendant Mazzuto
or IEAM.

85.     CW1 obtained knowledge of the stock trading scheme after witnessing
Mr. Vanucci's review of the Scottrade account statements to calculate his portion of

profits on a weekly basis. CW1 also overheard telephone calls between Mr. Vanucci and Mr. Mazzuto concerning the insider trading scheme.

86.     At least $206,000 in proceeds from these stock sales were wired from the Scottrade account to a Wachovia bank account registered to "Parrish Pond" from March 2007 through May 2007.

87.     Parrish Pond is a limited liability company created by Mr. Mazzuto, then believed to be controlled by his children. Parrish Pond's primary asset is a home located at 32 Parrish Pond Lane, Southhampton, New York, which was purchased by Parrish Pond at the direction of Mr. Mazzuto in October of 2006 for approximately $3.1 million.

88.     On March 21, 1007, $109,658.38 in proceeds from these stock sales were wired from the Scottrade account to a Bank of America account belonging to an Audi/Porsche dealership in Florida to purchase a Porsche for Mr. Mazzuto's girlfriend.

## NO SAFE HARBOR

89.     The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged in this Complaint. None of the statements alleged herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

90.     In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Officers of the Corporation are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of IEAM who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made. None of the historic or present tense statements made by the Officers of IEAM was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Officers of IEAM expressly related to or stated to be dependent on those historic or present tense statements were made.

### LOSS CAUSATION/ECONOMIC LOSS

91.     During the Class Period, the Officers of IEAM engaged in a scheme to deceive the market and a course of conduct that artificially inflated IEAM's stock price and operated as a fraud or deceit on purchasers of IEAM stock by misrepresenting the Company's financial condition and business prospects. Once the Officers of IEAM's misrepresentations and fraudulent conduct were disclosed to the market, IEAM's stock price reacted negatively as the artificial inflation was removed from it. As a result of their

purchases of IEAM stock during the Class Period, Plaintiffs and other members of the

Class suffered economic loss.

92.     The Officers of IEAM's false and misleading statements had the intended

effect and caused IEAM stock to trade at artificially inflated levels throughout the Class

Period.

93.     As investors and the market became aware of IEAM's prior misstatements

and omissions and that IEAM's actual financial condition and business prospects were, in

fact, not as represented, IEAM's stock price reacted negatively, damaging investors.

**Applicability of Presumption of Reliance:
Fraud-on-the-Market Doctrine**

94.     At all relevant times, the market for IEAM's common stock was an

efficient market for the following reasons, among others:

(a)     IEAM's stock met the requirements for listing, and was listed and

actively traded on the NASDAQ Capital Market and Bulletin Board, both highly efficient

and automated markets;

(b)     During the Class Period, on average 887,254 shares of IEAM

stock were traded on a weekly basis. During the Class Period approximately 13,297,754

shares were outstanding. Approximately 6.6% of the all outstanding shares were traded

on a weekly basis, demonstrating a very strong presumption of an efficient market.

(c)     As a regulated issuer, IEAM filed with the SEC periodic public

reports during the Class Period.

(d)     IEAM regularly communicated with public investors via

established market communications mechanisms, including regular disseminations of

press releases on the national circuits of major newswire services and other wide-ranging

public disclosures, such as communications with the financial press and other similar

reporting services;

   (e) IEAM was followed by several securities analysts employed by

major brokerage firms who wrote reports that were distributed to the sales force and

certain customers of their respective brokerage firms during the Class Period. Each of

these reports was publicly available and entered the public marketplace;

   (f) Numerous NASDAQ member firms were active market-makers in

IEAM stock at all times during the Class Period; and

   (g) Unexpected material news about IEAM was rapidly reflected in

and incorporated into the Company's stock price during the Class Period.

  95. As a result of the foregoing, the market for IEAM's common stock

promptly digested current information regarding IEAM from all publicly available

sources and reflected such information in IEAM's stock price. Under these

circumstances, all purchases of IEAM's common stock were at artificially inflated prices,

and a presumption of reliance applies.

## PLAINTIFFS' ALLEGATIONS

  96. Plaintiffs' claims are typical of the claims of the members of the previous

Class Action, as all members of the Class are similarly affected by defendants' wrongful

conduct in violation of federal and state law that is complained of herein and as

demonstrated by the criminal trial of James Marguiles that resulted in a guilty verdict and

the guilty plea conviction of John Mazzuto.

## FIRST CLAIM

**Violation of Section 10(b)**
**of the Exchange Act Against and Rule 10b-5**

**Promulgated Thereunder Against Defendant IEAM**

97.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

98.     This First Claim is asserted against defendant IEAM.

99.     During the Class Period, defendant carried out a plan, scheme and course conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase and/or sell IEAM's securities at artificially inflated and distorted prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, individually and as a group, took the actions set forth herein.

100.     Defendant, through its corporate officers, individually and in concert, directly or indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of IEAM as specified herein.

101.     These corporate officers employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of IEAM's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and

omitting to state material facts necessary in order to make the statements made about IEAM and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transaction, practices and a course of business that operated as a fraud and deceit upon the purchasers of IEAM's securities during the Class Period.

102.    IEAM's primary liability, and controlling person liability, arises from the following facts: (1) its employees were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of the Officers, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of the Officers enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; (4) each of the Officers was aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading; and (5) each of the Officers culpably participated in the wrongful conduct alleged herein.

103.    Officers of IEAM had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the trust in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such individuals' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing IEAM's

financial condition and future business prospects from the investing public and

supporting the artificially inflated or distorted price of its securities. As demonstrated by

the Officers ' overstatements and misstatements of the Company's financial condition

and business prospects throughout the Class Period, the Officers, if they did not have

actual knowledge of the misrepresentations and omissions alleged, were reckless in

failing to obtain such knowledge by deliberately refraining from taking those steps

necessary to discover whether those statements were false or misleading.

104.    As a result of the dissemination of the materially false and misleading

information and failure to disclose material facts, as set forth above, the market price for

IEAM's securities was artificially inflated during the Class Period. In ignorance of the

fact that market prices of IEAM's publicly-traded securities were artificially inflated or

distorted, and relying directly or indirectly on the false and misleading statements made

by Officers, or upon the integrity of the market in which the Company's securities trade,

and/or on the absence of material adverse information that was known to or recklessly

disregarded by Officers but not disclosed in public statements by Officers during the

Class Period, Plaintiffs and the other members of the Class acquired and/or sold IEAM

securities during the Class Period at artificially high prices and were damaged thereby.

105.    At the time of said misrepresentations and omissions, Plaintiffs and other

members of the Class were ignorant of their falsity, and believed them to be true. Had

Plaintiffs and the other members of the Class and the marketplace known the truth

regarding IEAM's financial results, which were not disclosed by the Officers, Plaintiffs

and other members of the Class would have not purchased or otherwise acquired IEAM

securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

106.   By virtue of the foregoing, the defendant IEAM has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

107.   As a result and proximate result of the Officers' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

108.   The original action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action, and as a result of the settlement, the time within the parties who opted out of the settlement and was extended for two years and one day.

## SECOND CLAIM

### IEAM Violated Section S-8 of the Securities and

### Exchange Act

109.   On January 24, 2005, IEAM filed a Form S-8 with the Securities and Exchange Commission that authorized IEAM to issue stock pursuant to an employee stock option plan (the "Stock Plan"). The Form S-8 authorized the issuance of up to 15 million shares of stock.

110.   Pursuant to the Stock Option Plan, therefore, IEAM was only permitted to issue shares to employees, officers, directors of IEAM, or consultants for IEAM. In other words, only natural persons who provided some service to IEAM were eligible to receive stock under the Stock Option Plan.

111.    On the face "S-8" shares are indistinguishable from publicly traded shares. However, shares issued under S-8 are restricted if they meet the definition of restricted shares under Rule 144 which is "securities acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction of chain of transactions not involving any public offering". Such sales may not be resold unless a registration statement is filed on the S-8 by means of a separate prospectus ("Reoffer Prospectus") prepared in accordance with the requirements of Part I of Form S-3 and filed with the registration statement on Form S-8.

112.    Finally, although the S-8 authorized the issuance of 15 million shares, a reverse 1 for 10 stock split on May 31, 2006, which should have reduced the amount of shares that could be issued to 1.5 million.

### IEAM Violated Section "S-8" of the Securities and Exchange Act

113.    Notwithstanding the various restrictions on the issuance of "S-8" shares, Mazzuto and Magulies as officers of the defendant directed that IEAM shares be issued to various entities and individuals who did not meet the requirements of the S-8 (i.e., individuals and entities that never performed any services for IEAM). In addition, despite the fact that the "S-8" shares were restricted, Mazzuto and Margulies caused IEAM shares to be issued without any restrictions. As a result, upon information and belief, most, if not all, of the IEAM shares that were issued pursuant to the Stock Option Plan were sold immediately, in violation of the restrictions of the S-8 causing losses and liabilities in excess of $150 million.

114.   In addition, many of the shares were sold after the May 31, 2006 reverse stock split, so as to take advantage of the enhanced prices by Mazzuto and Marguiles.

## THIRD CLAIM

115.   As a result of the Superseding Settlement Agreement Laurence M. Rosen, Esq. the attorney for the Lead Plaintiffs and the Class in the case of Annamarie Mallozzi et al vs. Industrial Enterprises of America, Inc. et al. Case No. 07-CV-10321, SDNY, is holding $1,000,000.00 in an escrow account in TD Waterhouse, NA, Pennsylvania.

116.   These funds are being held to be used in good faith to pay any settlement, judgments or awards in this Holdover Proceeding.

**WHEREFORE**, Plaintiffs' pray for relief and judgment, as follows:

(a)   Awarding compensatory damages in favor of Plaintiffs and against the defendants, for all damages sustained as a result the wrongdoing of the Defendant IEAM, in an amount to be proven at trial, including interest thereon;

(b)   Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(c)   Awarding Plaintiffs the $1,000,000.00 being held in escrow by Laurence M. Rosen, Esq. for the benefit of plaintiffs; and

(c)   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated:  November 24, 2011
        New York, New York  10001


                                        Respectfully submitted,

                                        HARVEY N. FERTIG

                                        Harvey N. Fertig
                                        Attorney for Plaintiff